IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MELVIN MUNIR,

        Plaintiff,                 No. CIV S-05-1996 MCE EFB P

    vs.

J. THOMAS, et al.,

        Defendants.        FINDINGS AND RECOMMENDATIONS

_____/

      Plaintiff is a prisoner without counsel suing for alleged civil rights violations.  *See* 42 U.S.C. § 1983; 42 U.S.C. § 12203.  Presently pending before the court is the April 30, 2007, motion for summary judgment filed by defendants Jones, Martinez, Murray, and Thomas.

      Plaintiff's October 13, 2005, first amended complaint claims that defendants were deliberately indifferent to his serious medical needs and violated his rights under the anti-retaliation provision of the Americans with Disabilities Act ("ADA").  In particular, he alleges the following: (1) on July 16, 2004, defendant Thomas forced plaintiff to sleep in an upper bunk even though Thomas knew that plaintiff had medical orders to be assigned to a lower bunk because of a vision impairment; (2) after he fell from an upper bunk on July 20, 2004, and was given further authorization to sleep in a lower bunk, defendants Martinez, Murray and Jones forced plaintiff to sleep in an upper bunk; (3) defendants Martinez, Murray and Jones caused

1  plaintiff to be placed into administrative segregation for plaintiff's refusal to "lock up" in his cell

2  where he was assigned to an upper bunk; and (4) defendants Martinez, Murray and Jones

3  violated the anti-retaliation provision of Americans with Disabilities Act by refusing to permit

4  him access to a lower bunk.  For the reasons explained below, the court finds that there is no

5  genuine issue for trial and that summary judgment must be granted.

6  **I.   Facts**

7         At all times relevant to this action, plaintiff was housed either at Ironwood State Prison

8  ("ISP") or at California Medical Facility ("CMF").  Defendant Sgt. Thomas was a housing

9  sergeant, Murray was a sergeant, Jones was a lieutenant and Martinez was a guard at CMF.  First

10  Am. Compl. ("Am. Compl."), ¶¶ 18-19, 39-40.

11         In order to understand the court's disposition, it is necessary to recount some of

12  plaintiff's medical history.  In 1996, he was diagnosed with a condition known as "bilateral

13  keratocunus," for which he received a corneal transplant.  Defs.' Stmt. of Undisp. Facts ("SUF"),

14  Ex. B ("Defs.' Ex. B"), Attach. 1, pp. 5-6.  In February 1999, a physician diagnosed plaintiff

15  with blindness of the right eye.  *Id*., Attach. 1, p. 1.  The vision in his left eye was better than

16  20/20 without corrective lenses.  *Id.*  However, by October 1999, plaintiff had developed

17  advanced keratocunus in the left eye and the right eye corneal transplant had failed.  *Id.*, Attachs.

18  1, 2.  The Chief Medical Officer ("CMO") at Ironwood State Prison, therefore, wrote in a

19  document entitled, "CMO to CMO Agreement (CMF),"  that plaintiff had a visual disability that

20  impacted his housing.  *Id*., Attach. 1, at 3.  The Chief Medical Officer medically cleared plaintiff

21  for transfer from ISP to CMF, noting that plaintiff "needs a low bunk."  *Id.*  This note also stated

22  that the "[m]edical chart must accompany the inmate."  *Id.*   Plaintiff was transferred from ISP to

23  CMF on or around October 27, 1999.  *Id*., Attach. 1, at 4.

24         On July 17, 2001, based upon an ophthalmologist's recommendation, the Chief Medical

25  Officer at CMF gave permission for plaintiff to wear dark glasses inside and outside.  Defs.' Ex.

26  B, Attach. 1, p. 8.  This authorization was to last for one year.  *Id.*

1    In July 2001, plaintiff was housed in an upper-tier cell.  Defs.' Ex. B, Attach. 1, pp. 10-

2    11.  An ophthalmologist and the Chief Medical Officer gave plaintiff written authorization to use

3    dark glasses in light of his condition, but gave no written authorization for plaintiff to be

4    assigned a lower bunk.  *Id.*  On February 22, 2002, a physician at CMF found plaintiff had a

5    permanent visual impairment that did not impact his housing placement.  *Id.*, p. 13; Pl.'s Opp'n,

6    Ex. 1, p. 3.  On June 25, 2002, the Chief Medical Officer renewed this authorization, to be

7    effective for one year.  Defs.' Ex. B, Attach. 1, p. 12.

8    In early July 2003, plaintiff injured his right eye, necessitating surgery.  Defs.' Ex. B,

9    Attach. 1, pp. 23-25.  By late July, physicians agreed that the injury had caused permanent

10   blindness to plaintiff's right eye.  Defs.' Ex. A, Attach. 1, pp. 28-29.  The treating physician, Dr.

11   Low, stated in the July 24, 2003, hospital discharge report that while in the hospital, plaintiff

12   used a vest that identified him as visually impaired and permission to use an eye shield and

13   sunglasses, and permission to be assigned only to a lower bunk.  Defs.' Ex. B, Attach. 1, pp. 28-

14   29.  Plaintiff's treatment plan was to have a follow-up appointment with the prison

15   ophthalmologist within seven days. *Id.*, at 29.  On July 21 and 22, 2003, Dr. Low and the Chief

16   Medical Officer at CMF authorized plaintiff's continued use of an eye shield, sunglasses and a

17   vest, but they did not mention a lower bunk.  *Id.*, at 26-27.  This authorization was to last one

18   year.  *Id.*  As of April 13, 2004, plaintiff was assigned to a lower bunk, but not based upon any

19   written recommendation or authorization.  Defs.' Ex. B, Attach. 1, at 30.

20   Following a riot in 2004, plaintiff was placed in administrative segregation.  He was

21   released on July 16, 2004.  Defs.' Ex. B. Comp., ¶¶ 13-14.  At his new cell in the general

22   population, plaintiff learned that he was assigned to an upper bunk.  *Id.*, ¶¶ 15-17.  Plaintiff told

23   Officer Guerrero, who is not a defendant, that he had written doctor's orders to be assigned to a

24   lower bunk because of a disability.  *Id.*, ¶ 17.  Guererro ordered plaintiff to "lock up"in the cell

25   and went to speak with defendant Thomas.  Thereafter, Guererro informed plaintiff that there

26   was no such order.  Am. Compl., ¶ 20.  The guard requested that plaintiff show him a copy of the

written order.  Am. Comp., ¶ 20.  Plaintiff did not have it, asserting it was in his medical file and

with his property which had been confiscated before he was placed in administrative segregation.

*Id.*, ¶¶ 23-24.  On July 17, 2004, plaintiff spoke with Officer Aronsen, who is not a defendant,

about being assigned to a lower bunk.  Am. Compl., ¶ 26.  Aronsen checked the daily log book

to verify plaintiff's housing needs, and learned that Thomas had given orders not to move

plaintiff from the cell he then occupied.  *Id.*  Plaintiff spoke with the Program Sergeant,

explaining that he was legally blind and had a physician's order to be assigned to a lower bunk.

*Id.*, ¶ 30.  After consulting with Thomas, the Program Sergeant explained to plaintiff that they

had reviewed his file but found no such order.  *Id.*, ¶¶ 31, 32.  Thus, the officers refused to move

plaintiff to a cell where he could sleep in a lower bunk.  *Id.*, ¶ 32.

On July 20, 2003, at about 4:15 p.m., plaintiff fell from his upper bunk.  Defs.' Ex. B,

Attach. 1, at 35.  Defendant Martinez responded to a call for help, and staff took plaintiff to the

clinic, where plaintiff reported severe pain in his lower back.  Defs.' Ex. B, Attach. 1, pp. 35-36;

Am. Compl., ¶¶ 39-40.  Plaintiff explained that he was legally blind in his left eye and had no

vision in his right eye.  *Id.*  The physician noted that plaintiff's lower back was tender, but found

no obvious bruises or swelling.  *Id.*  The doctor ordered medication for muscle spasms and wrote

a note stating, "Please house pt. in lower bunk" because of "visual impairment."  Defs.' Ex. B,

Attach. 1, at 38.  At about 5:00 p.m., plaintiff returned to his cell.  Defs.' Ex. B, Attach. 1, p. 35.

It is not clear at what time, but also on July 20, 2004, the Chief Medical Officer at CMF

authorized plaintiff to be assigned to a lower tier cell and a lower bunk because of plaintiff's

visual impairment.  Defs.' Ex. B, Attach. 1, p. 39.  This authorization was to remain in effect for

one year.  *Id.*

Upon returning to his cell, plaintiff showed defendant Martinez the request for a lower

bunk assignment.  Am. Compl., ¶ 45.  Defendant Martinez called the Third Watch Sergeant,

defendant Murray, who came to speak with plaintiff.  *Id.*, ¶ 46.  While plaintiff explained his

version of events, Murray interrupted and ordered plaintiff to "lock up."  *Id.*  Plaintiff persisted

1   in his explanation, but Murray refused to listen.  *Id.*, ¶ 47.  After Murray left, Martinez ordered

2   the prisoners on that wing to "lock up."  *Id.*, ¶ 45.  Plaintiff told Martinez that a doctor had told

3   him not to climb back up into the bunk, and showed Martinez the order.  *Id.*  Martinez called

4   defendant Murray back.  *Id.*, ¶ 49.  Just before a routine count of prisoners, Murray told

5   defendant Jones that plaintiff refused to return to his cell.  SUF, Ex. C, Jones Decl., ¶ 2.  Jones

6   spoke with plaintiff, who explained the recommendation from the physician that he not return to

7   the upper bunk.  *Id.*  Jones checked with staff in charge of housing and learned that plaintiff's

8   most recent disability verification did not restrict plaintiff's housing, and that in any event there

9   were no available lower bunks to which plaintiff could be moved in the general population.  *Id.*

10  There were, however, available lower bunks in administrative segregation.  *Id.*  Jones told

11  plaintiff that he had the choice of returning to his cell or going to administrative segregation for

12  the night, where he would have a cell to himself and a lower bunk.  *Id.*  Plaintiff still refused to

13  return to his cell.  Therefore, Jones ordered him to administrative segregation.  *Id.*

14       Thus, at around 9:45 p.m., officers took plaintiff to the medical clinic, where he was

15  examined by a physician and cleared for housing in administrative segregation.  Defs.' A,

16  Attach. 1, pp. 7, 9.  The next day, plaintiff was cleared for release from administrative

17  segregation as soon as a bed became available.  *Id.*, p. 8.  At around 2:00 p.m. the next day,

18  plaintiff was released from administrative segregation and was assigned to a general population

19  cell.  Jones Decl. , ¶ 3.  Plaintiff's disability verification had not been updated, and housing staff

20  were still trying to find a cell with a lower bunk for plaintiff.  *Id.*  Since CMF is a medical

21  facility, at any given time most lower bunks are assigned to prisoners with medical needs for

22  such bunks.  *Id.*  Thus, it may not be possible immediately to accommodate a request for a lower

23  bunk.  *Id.*  Plaintiff was assigned a cell and allowed to put his mattress on the floor until an

24  available lower bunk was found.  *Id.*  On July 21, 2003, plaintiff was assigned to a lower bunk in

25  a different cell.   Am. Compl., ¶ 55; Defs.' Ex. B, Attach. 1, p. 15; Jones Decl., ¶ 3.

26  ////

1   On July 29, 2004, an ophthalmologist and Dr. Bick gave written authorization for

2   plaintiff to have a vest to identify him as visually impaired, lightly tinted safety glasses and a

3   lower bunk, or transfer to a facility that would meet that need.  Defs.' Ex. B, Attach. 1, p. 42.

4   **II.      Standards on Summary Judgment**

5   Summary judgment pursuant to Fed. R. Civ. P. 56(a) avoids unnecessary trials in cases

6   with no disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of*

7   *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a

8   sufficient disagreement to require submission to a jury or whether it is so one-sided that one

9   party must prevail as a matter of law."[1]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

10  (1986).  Rule 56 serves to screen the latter cases from those which actually require resolution of

11  genuine disputes over facts material to the outcome of the case; e.g., issues that can only be

12  determined through presentation of testimony and evidence at trial such as credibility

13  determinations of conflicting testimony over dispositive facts.

14              In three recent cases, the Supreme Court, by clarifying what the
            non-moving party must do to withstand a motion for summary
15              judgment, has increased the utility of summary judgment. First, the
            Court has made clear that if the non-moving party will bear the
16              burden of proof at trial as to an element essential to its case, and
            that party fails to make a showing sufficient to establish a genuine
17              dispute of fact with respect to the existence of that element, then
            summary judgment is appropriate.  *See Celotex Corp. v. Catrett*,
18              477 U.S. 317 (1986).  Second, to withstand a motion for summary
            judgment, the non-moving party must show that there are "genuine
19              factual issues that properly can be resolved only by a finder of fact
            because they may reasonably be resolved in favor of either party."
20              *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) (emphasis
            added).  Finally, if the factual context makes the non-moving
21              party's claim implausible, that party must come forward with more
            persuasive evidence than would otherwise be necessary to show
22              that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.
            Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
23              argued that *any disagreement* about a material issue of fact

24  ────────────────────

25      [1]  On October 5, 2004, the court informed plaintiff of the requirements for opposing a
    motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154
    F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*
26  *Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1    precludes the use of summary judgment.

2    *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

3    *denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no

4    "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to

5    establish the existence of an element essential to that party's case, and on which that party will

6    bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236,

7    239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

8          Thus, to overcome summary judgement an opposing party must show a dispute that is

9    both genuine, and involving a fact that makes a difference in the outcome.  Two steps are

10   necessary.  First, according to the substantive law, the court must determine what facts are

11   material.  Second, in light of the appropriate standard of proof, the court must determine whether

12   material factual disputes require resolution at trial.  *Id.,* at 248.

13         When the opposing party has the burden of proof on a dispositive issue at trial, the

14   moving party need not produce evidence which negates the opponent's claim.  *See e.g., Lujan v.*

15   *National Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  The moving party need only point to matters

16   which demonstrate the absence of a genuine material factual issue.  *See Celotex v. Cattret*, 477

17   U.S. 317, 323-24 (1986).

18         If the moving party meets its burden, the burden shifts to the opposing party to establish

19   genuine material factual issues.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586.[2]  The opposing

20   party must demonstrate that disputed facts are material, i.e., facts that might affect the outcome of

21   the suit under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific*

22   *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e., the

23

24         [2]  The nonmoving party with the burden of proof "must establish each element of his
     claim with significant probative evidence tending to support the complaint."  *Barnett v. Centoni*,
25   31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted).  A complete failure of proof on an
     essential element of the nonmoving party's case renders all other facts immaterial, and entitles
26   the moving party to summary judgment.  *Celotex*, 477 U.S. at 322.

1  parties' differing versions of the truth require resolution at trial, *see T.W. Elec.*, 809 F.2d at 631.

2  The opposing party may not rest upon the pleadings' mere allegations or denials, but must present

3  evidence of specific disputed facts. *See Anderson*, 477 U.S. at 248.[3]  Conclusory statements

4  cannot defeat a properly supported summary judgment motion. *See Scott v. Rosenberg*, 702 F.2d

5  1263, 1271-72 (9th Cir. 1983).

6       The court does not determine witness credibility.  It believes the opposing party's

7  evidence, and draws inferences most favorably for the opposing party.  *See Anderson*, 477 U.S. at

8  249, 255.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce

9  evidence of a factual predicate from which to draw inferences.  *American Int'l Group, Inc. v.*

10  *American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*,

11  477 U.S. at 322).

12       If reasonable minds could differ on material facts at issue, summary judgment is

13  inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other

14  hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

15  nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation

16  omitted).  In that case, the court must grant summary judgment.

17       With these standards in mind, it is important to note that plaintiff bears the burden of

18  proof at trial over the issue raised on this motion, i.e., whether the defendant acted with deliberate

19  indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference" is an

20  essential element of plaintiff's cause of action.  Therefore, to withstand defendant's motion,

21  plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a

22  genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he

23  must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the

---

25  [3]  A verified complaint may be used as an affidavit in opposition to the motion.
26  *Schroeder v McDonald*, 55 F. 3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam).

1    evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

2    **III.    Analysis**

3         "As to materiality, the substantive law will identify which facts are material.  Only

4    disputes over facts that might affect the outcome of the suit under the governing law will properly

5    preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Here, plaintiff's action

6    arises under 42 U.S.C. Section 1983 and the Eighth Amendment, and pursuant to 42 U.S.C.

7    § 12203(a).  To prevail at trial on his constitutional claims, he must prove that the defendants

8    deprived him of his Eighth Amendment rights while acting under color of state law.  To do this,

9    plaintiff must show by a preponderance of competent evidence that the defendant knew plaintiff

10   faced a risk of harm that "is not one that today's society chooses to tolerate," and that the

11   defendant was "deliberately indifferent" to that risk.  *Farmer v. Brennan*, 511 U.S. 825, 834, 837

12   (1994).  As discussed below, plaintiff has failed to establish a genuine dispute for trial over this

13   issue.

14        With respect to the ADA claim, plaintiff must make a prima facie showing that his

15   engagement in an activity protected under the ADA caused defendants to take adverse action

16   against him.  *Brown v. City of Tuscon*, 366 F.3d 1181, 1186-87 (9th Cir. 2003).[4]  For the reasons

17   explained below, the court finds that plaintiff has submitted evidence sufficient to avoid summary

18   judgment.

19        **A.  Eighth Amendment Claims**

20        Plaintiff asserts that on July 16, 2004, defendant Thomas knew that there was an order

21   directing that plaintiff be given a lower bunk because of his vision impairment, but nonetheless

22   forced plaintiff to sleep in an upper bunk.  Plaintiff asserts that as a result, he fell while climbing

23

24        [4]  The claim of retaliation for protected activity does not require proving an underlying
     violation of Title II of the ADA.  *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007);
25   *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 938 (7th Cir. 2006); *Williams v. Philadelphia Hous.
     Auth. Police Dep't*, 380 F.3d 751, 759 (3rd Cir. 2004); *Heisler v. Metro. Counsel*, 339 F.3d 622,
26   630 (8th Cir. 2003).

from the upper bunk.  Defendant Thomas asserts that there is no genuine issue about whether he

was deliberately indifferent.[5]

Prison officials violate the Eighth Amendment when they engage in "acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976).  A prison official is deliberately indifferent when he knows of

and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."

*See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The official must "be aware of the facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at

837.  Prison officials act with deliberate indifference when they "intentionally interfer[e] with" a

prescribed treatment.  *Estelle*, 429 U.S. at 104-05; *Hutchinson v. United States*, 838 F.2d 390, 394

(9th Cir. 1988) (deliberate indifference occurs when prison officials deny, delay or intentionally

interfere with medical treatment").  Proof that "a prison official has ignored the instructions of a

prisoner's treating physician" is grounds for finding an Eighth Amendment violation.  *See*

*Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (allegation that guard ignored

doctor's order to dispense medication before plaintiff was released from prison stated claim for

deliberate indifference).  Defendant Thomas asserts that there was no "chronos," or "disability

verification" (but does not define these terms or explain their significance) authorizing plaintiff to

have a lower bunk between July 16, 2004, and time he fell on July 20, 2005[4].  Plaintiff alleges

that his medical file contained an order that he be assigned to a lower bunk.  It is undisputed that

---

[5] Defendants do not dispute that plaintiff's visual impairment was a serious medical
need.  For Eighth Amendment purposes, such a need is a medical condition that significantly
affects an individual's daily activities, an injury or condition a reasonable doctor or patient would
find worthy of comment or treatment or chronic and substantial pain.  *See, e.g.*, *McGuckin v.
Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v.
Miller*, 104 F.2d 1133, 1136 (9th Cir. 1997) (*en banc*).  The record is replete with the care
plaintiff received for keratocunus and related complications.  The court finds that plaintiff's
condition required ongoing monitoring and treatment, and indisputably constitutes a serious
medical need.

1  plaintiff was visually impaired in 2003.  It also is undisputed that when he was transferred to

2  CMF in 1999, a prison physician recommended that plaintiff be assigned to a lower bunk.  Upon

3  his arrival at CMF, however, plaintiff was under the care of different doctors.  Defendant Thomas

4  submits evidence that in July 2001, plaintiff had permission to use special glasses and in 2002,

5  plaintiff's impairment was documented as a disability.  However, there was no finding that the

6  disability affected his housing.  In 2003, while hospitalized after an injury to his right eye, he was

7  assigned to a lower bunk, but this assignment was not continued when he returned to the prison's

8  general population.  Finally, although there is evidence that plaintiff occupied a lower bunk in

9  April of 2004, there is no evidence that this was based on medical orders.

10       The question, then, is whether the defendants knew of the existence of medical orders that

11  plaintiff be housed in a lower bunk because of a serious medical condition but chose to ignore

12  that need.  The issue here is not one of negligence but deliberate indifference.  It is important to

13  note that although the court must draw all reasonable inferences in favor of the plaintiff as the

14  non-moving party, plaintiff has the burden of proof at trial.  Thomas has supported his motion

15  with records.  Thus, plaintiff cannot rest on the mere allegations of his pleading.  As noted above,

16  Thomas relies on the fact that no "chrono" or "disability verification" authorizing plaintiff to be

17  assigned to a lower bunk was in plaintiff's medical file at the time he fell from his bunk.

18  Considering that this is the sole fact upon which Thomas relies, the court naturally questions the

19  definition, purpose and significance of such documents.  Thomas, however, offers none.  Thus,

20  their absence from plaintiff's medical records does not help Thomas, and the court turns to the

21  records that *were* in plaintiff's medical file.

22       One of those documents is the October 22, 1999, "CMO to CMO Agreement," signed by

23  the Chief Medical Officer of Ironwood State Prison, finding that plaintiff's visual disability

24  necessitated that he have a lower bunk.  It is undisputed that when plaintiff was transferred from

25  Ironwood State Prison to California Medical Facility, this agreement, signed by the Chief Medical

26  Officer of Ironwood State Prison, not only stated that plaintiff needed a lower bunk to

accommodate his visual impairment; but also stated that the agreement must be maintained in plaintiff's medical file.  Presumably this direction was included so as to ensure that this accommodation did not lapse over time.  There is no evidence of who at California Medical Facility, if anyone, read it.  However, the court finds it reasonable to infer that the document remained with plaintiff's medical records, and that anyone conducting a thorough review of plaintiff's medical records would have seen it.  Defendant Thomas does not submit a declaration; and, therefore, the court cannot discern whether he conducted a careful and thorough search for records suggesting that plaintiff required a lower bunk.  Nor can the court determine whether other prison staff conducted a careful and thorough search such that Thomas reasonably could rely on information from them.  The record contains other authorizations for plaintiff to have various accommodations for his disability, each of which specifies the time for which they were to remain in effect.  The October 22, 1999, agreement did not limit the time that plaintiff would need a lower bunk.  There is no evidence about the significance of the October 22, 1999, "CMO to CMO Agreement."  Thus, the court cannot make any finding about whether California Medical Facility officials were bound by it, whether they had discretion to disregard it, or whether an official at California Medical Facility had to issue an order or directive to give effect to the agreement.  Thus, while plaintiff has not submitted any evidence that from July 16, 2004, until he fell on July 20, 2004, his central or medical file contained specific direction by CMF officials directing that he have a lower bunk, this fact is inapposite.  There remain the unanswered questions of whether Thomas himself conducted a thorough search of plaintiff's file or reasonably relied on someone else who did, and if so whether they saw the October 22, 1999, CMO to CMO agreement.  There also remains the question of what effect the agreement had on California Medical Facility officials.  The court finds that there is a genuine dispute about whether plaintiff's file contained a written order requiring that California Medical Facility staff provide plaintiff with

////

////

a lower bunk and whether defendant Thomas knew of it.[6]   Defendant Thomas is not entitled to judgment as a matter of law on this claim.

Plaintiff also asserts that defendants Martinez, Murray and Jones violated the Eighth Amendment by ignoring a medical recommendation that plaintiff be assigned to a lower bunk. The medical recommendation at issue here was drafted by a physician on July 20, 2004, after plaintiff had fallen from his upper bunk.  It is undisputed that at around 4:15 p.m. on July 20, 2004, plaintiff fell while descending from his upper bunk and that he went to the medical clinic for his injuries.  The physician who treated plaintiff for his injuries resulting from the fall wrote a note requesting that plaintiff be provided a lower bunk because of plaintiff's visual impairment. At about 5:00 p.m., the plaintiff returned to his cell with a note from his physician requesting that he be given a lower bunk.  At some point that day, the Chief Medical Officer formalized the request that plaintiff be given a lower bunk into an actual order.  However, there is no evidence of when this order was placed in files accessible to guards, or whether the order otherwise was communicated to them.

When it was time for the prisoners in plaintiff's housing wing to lock up for the night, plaintiff told Martinez that his doctor had prescribed a lower bunk, and showed Martinez the doctor's note.  In response to seeing this request, Martinez called a superior officer, defendant Murray.  Murray, however, cut plaintiff's explanation short, ordered plaintiff to lock up and walked away.  Plaintiff persisted in his demand for a lower bunk, again showing Murray the note. Martinez notified Murray, and Murray told Jones that plaintiff refused to go to his cell.  Thus, Jones spoke with plaintiff and plaintiff showed Jones the physician's note.  Jones checked with staff familiar with housing, who informed him that plaintiff's most recent disability documentation made no orders or recommendations about housing.  They also informed Jones

_____

[6] The court notes that plaintiff's claim hinges on the allegation that there was a written order for him to have a lower bunk.  He does not claim that his merely informing Thomas of his condition obliged Thomas to take reasonable measures to provide him with a lower bunk.

that there were no lower bunks available in the general population, but there were in

administrative segregation.

Jones offers evidence that he gave plaintiff a choice of sleeping in his assigned upper bunk

or returning to administrative segregation, where he could sleep in a lower bunk.  The parties

agree that plaintiff refused to return to his cell and that he therefore was ordered into

administrative segregation.  By this time, it was around 9:45 p.m.  Officers escorted plaintiff to

the medical clinic to have him medically cleared for administrative segregation, and then to

administrative segregation.  Defendants have presented evidence that plaintiff had a lower bunk

there, and that he was released the next day.  For one night plaintiff was permitted to put his

mattress on the floor and sleep there in order to avoid the perils of climbing in and out of the

upper bunk.  On July 22, 2004, plaintiff was assigned to a lower bunk in a different cell.

On this evidence, plaintiff simply cannot prevail.  Again, it is his burden to show

deliberate indifference.  A mistake, or even negligence, is not enough.  Martinez did not ignore

plaintiff's requests, but instead repeatedly summoned a superior officer.  Plaintiff offers no

evidence that Martinez had the authority to accommodate plaintiff immediately.  The evidence

presently before the court shows that Martinez took reasonable steps in light of the information

she had.  Similar analysis holds for defendant Murray.  While Murray was less receptive to

plaintiff's request and initially refused to listen, in the end he also summoned a superior officer.

Plaintiff submits no evidence that Murray could have accommodated plaintiff's request without

consulting a superior officer.  Jones also submits evidence that he took reasonable steps in light of

plaintiff's request and the information available to him.  Jones checked plaintiff's files and

requested information from housing officials.  When he learned that there was no current order

for plaintiff to be housed in a lower bunk and that no lower bunks were available for plaintiff at

that moment, he nonetheless offered plaintiff a cell of his own with a lower bunk, even if it was in

administrative segregation.  Jones did not ignore the needs that plaintiff expressed or any medical

directions in plaintiff's file.  This evidence cannot not support a finding that Martinez, Murray or

1   Jones was deliberately indifferent to plaintiff's visual impairment.  Accordingly, these three

2   defendants are entitled to judgment as a matter of law on this claim.

3       **B.  Americans with Disabilities Act ("ADA") Claim**

4       Plaintiff  asserts that by forcing him to sleep in an upper bunk and by moving him to

5   administrative segregation when he asserted his rights under Title II of the ADA, Martinez,

6   Murray and Jones "intentionally intimidated, threatened, coerced and otherwise retaliated against

7   plaintiff, " for asserting his rights under the ADA.[7]  Am. Compl., at 14.  Defendants contend that

8   plaintiff cannot present evidence sufficient to establish a genuine issue that they retaliated against

9   him.

10      As an initial matter, the court must address whether plaintiff has a cause of action against

11  defendants in their individual capacity.  Title II of the ADA provides a remedy to persons who

12  suffer discrimination by a public entity in access to its programs and services.  *Arc of Washington*

13  *State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).  Title IV of the ADA contains an ani-

14  retaliation provision that states that "[n]o person shall discriminate against any individual because

15  such individual has opposed any act or practice made unlawful by this chapter or because such

16  individual made a charge, testified, assisted, or participated in any manner in an investigation,

17  proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The Ninth Circuit has yet to

18  address whether this statute creates a cause of action against a person in his individual capacity.

19  *////*

20

21

_____

22      [7]  In addition to an anti-retaliation provision, the ADA contains an anti-coercion
    provision, which provides:

23
        It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
24      in the exercise or enjoyment of, or on account of his or her having exercised or
        enjoyed, or on account of his or her having aided or encouraged any other
25      individual in the exercise or enjoyment of, any right granted or protected by this
        chapter.

26  42 U.S.C. §12203(b).

It appears that only the Eleventh Circuit has addressed the question directly.[8]  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164-1180 (11th Cir. 2003).  That court decided that a plaintiff asserting rights to public accommodation can bring suit against individual defendants under the anti-retaliation provisions.  *Shotz* 344 F.3d at 1179; *see also Higdon v. Eberhardt*, 393 F.3d 1211, 1218-19 (11th Cir. 2004) (the ADA does in fact "recognize[] retaliation claims outside the employment context.").  Having considered this action and reviewed the record, the court finds that plaintiff cannot demonstrate a genuine issue of material fact about whether defendants violated the anti-retaliation and anti-coercion provisions of the ADA.  Accordingly, the court assumes, without actually adopting the holding in *Shotz*, that these provisions of the ADA create a cause of action against defendants in their individual capacity, and finds that defendants are entitled to judgment as a matter of law.

　　　To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate that (1) he or she was engaged in a protected activity; (2) suffered an adverse action; and (3) there was a causal link between the two.  *Brown v. City of Tuscon*, 336, F.3d 1181, 1186-87 (9th Cir. 2003).  Once a prima facie case is shown, the plaintiff will avoid summary judgment unless the defendant offers legitimate reasons for the adverse action.  *Parti v. Kaiser Foundation Hospitals*, 389 F.3d 840, 849 (9th Cir. 2004).  Then the burden shifts to the plaintiff to demonstrate that the reasons offered are pretextual.  *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).  Asserting one's rights under the ADA is a protected activity.  *Parti*, 389 F.2d at 850.  An action is deemed adverse if it is "reasonably likely to deter [individuals] from engaging in protected activity."  *Id.*  Retaliatory intent may be inferred when an adverse action closely follows the engagement in a protected activity.  *Id.*  While the majority of cases address the burdens and standards in the employment context, any legitimate penological justification for the adverse action will suffice in the prison context.  *See Shotz*, 344 F.3d at 1181 ("Clearly, a

---

[8]  An opinion of the Second Circuit assumed that such a cause of action exists.  *Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 n. 1 (2d Cir. 2002).

plaintiff need not demonstrate an adverse *employment* action when establishing a prima facie case of retaliation in the public services or accommodations contexts of the ADA, only that some type of action occurred that sufficiently qualifies as adverse under the circumstances of the case."); *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir.1994) (per curiam) (prisoner making retaliation claim must prove that the adverse action did not advance any legitimate penological goal).

Plaintiff asserts that defendants Martinez, Murray and Jones denied his request for a lower bunk in retaliation for plaintiff repeatedly requesting that he be placed in a cell where he could have a lower bunk.  It is undisputed that when he returned from the medical clinic on July 20, 2007, plaintiff showed Martinez the doctor's note requesting that he be assigned to a lower bunk. It also is undisputed that Martinez called her superior officer, defendant Murray, to assist in the matter.  Murray refused to listen to plaintiff, ordered plaintiff into his cell and walked away. Plaintiff showed Martinez the note again, and she called Murray back.  Murray in turn called defendant Jones.  Jones listened to plaintiff's account and examined plaintiff's records.  He found no current order stating that plaintiff's disability or medical needs required that he be assigned to a lower bunk.  Jones therefore gave plaintiff the option of sleeping in his then-assigned cell or going to administrative segregation.

Plaintiff had a documented condition recognized under the Act as a disability.  *See E.E.O.C. v. United Parcel Service, Inc.*, 306 F.3d 794, 801-04 (9th cir. 2002) (discussing when visual impairment amounts to a disability).  Moreover, defendants do not contest his visual impairment as qualifying as a disability under the Act.  It is also undisputed that he repeatedly insisted on a lower bunk to accommodate that disability and that he repeatedly insisted that his medical file contained a written medical order that he have a lower bunk.  There is no question that the element of engaging in protected activity under the ADA is satisfied.

However, it is not so clear that these three defendants took any action that could be characterized as "adverse."  The question is whether these defendants' responses can be found "reasonably likely to deter [individuals] from engaging in protected activity."  *Pardi*, 389 F.2d at

850.  Here, the evidence shows that Martinez listened to plaintiff and responded by calling a superior officer.  There is no evidence that Martinez by words or actions suggested that she responded this way for any reason other than that she could not grant plaintiff's request herself.  Neither is there evidence that she wrote a disciplinary report or reprimand to be placed in plaintiff's central file.  There is no evidence that she in any way communicated to plaintiff that he would regret having made the request.  The evidence shows that she, herself, declined to make any decision about plaintiff's housing.  Instead, she communicated the request up the chain of command.  Furthermore, plaintiff continued to insist on his rights when he spoke to Murray and Jones.  On this evidence, no reasonable jury could find that Martinez's actions were retaliatory or reasonably likely to deter plaintiff from insisting that prison officials accommodate him.  This essential element fails, and defendant Martinez is entitled to judgment as a matter of law.

Neither has plaintiff provided sufficient evidence to overcome summary judgment as to Murray.  Plaintiff submitted evidence showing that Murray was impatient with him and, at most, uninterested in accommodating him.  But despite interrupting plaintiff and initially walking away, when pressed for a response Murray contacted his own superior officer, Jones.  There is no evidence that Murray threatened plaintiff or in any way communicated to him that he would be punished for insisting on a lower bunk.  There is no evidence that Murray wrote a disciplinary report or reprimand, or that he took or threatened to take any adverse action against the plaintiff because of his request.  Furthermore, plaintiff continued to insist on his rights when he spoke to Jones.  Again, on the evidence before the court, no reasonable jury could find that Murray's actions were reasonably likely to deter plaintiff from insisting that prison officials accommodate him.  This essential element fails, and defendant Murray is entitled to judgment as a matter of law.

With respect to Jones, the court arrives at the same conclusion.  Jones has submitted uncontested evidence that he checked plaintiff's central file for orders consistent with what plaintiff reported to him.  He found no document authorizing him to provide plaintiff with a lower

bunk based on a disability.  Housing officers informed him that there was no current

documentation to that effect and that there were no lower bunks available in cells to which

plaintiff could be moved.  This is consistent with Jones's assertion that because CMF is a medical

facility, at any given time most lower bunks are occupied by prisoners based on medical needs.

He could not immediately move plaintiff to a cell in the general population where he could sleep

in a lower bunk.  He explained this to plaintiff and offered plaintiff the choice of remaining where

he was or moving to administrative segregation, where he could have his own cell and a lower

bunk.  There is simply no evidence that Jones denied the request based on a retaliatory motive, or

that he took, or threatened to take adverse action against the plaintiff because of his request.  The

evidence cannot reasonably support a finding that any adverse action was taken against plaintiff

for engaging in protected activity.

The court notes that when plaintiff refused to return to his cell and lock up for the night,

Jones was no longer addressing an inmate engaging in protected activity.  An inmate has no right

under the ADA to refuse to return to a cell.  As this point, Jones faced a security matter, i.e., a

disobedient prisoner at the time of lock up for the nightly count.  There is no evidence that Jones

(or any defendant) wrote a disciplinary report or even a reprimand for plaintiff's refusing to lock

up.  As a prisoner, plaintiff is limited in how he can demand accommodation.  *See Pell v.*

*Procunier*, 417 U.S. 817, 822, 826 (1984) (noting that managing a prison is a particularly

complex endeavor; thus, courts give great deference to prison administrators' security policies

and decisions).  Once Jones gave him the option of locking up or going to administrative

segregation where a lower bunk was available, plaintiff had to make a choice.  But he could not

refuse to enter a cell.

Furthermore, it is undisputed that plaintiff was released the next day and there is no

evidence that he was subjected to any disciplinary action or adverse notations in his central file as

a result of his demand to be accommodated.  In fact, he was accommodated within two nights of

his demand.  On this evidence, no reasonable jury could find that Jones's decision to move

plaintiff to administrative segregation was retaliatory or "adverse" and causally connected to plaintiff's asserting his rights.  Thus, these elements fail and Jones is entitled to judgment as a matter of law.

### C.  Qualified Immunity

Defendants allege that they are entitled to qualified immunity.  There is no need to consider the defense of qualified immunity with respect to the claims upon which the court has resolved the summary judgment motion on merits in favor of defendants.  *See Wilkie v. Robbins*, 127 S.Ct. 2588, 2608 (2007).  The court has found that defendants Martinez, Murray and Jones are entitled to judgment as a matter of law on all of plaintiff's claims against them.  Thus, the court only considers whether defendant Thomas is entitled to qualified immunity on plaintiff's claim that he was deliberately indifferent to plaintiff's serious medical need.

A motion for summary judgment based on the defense of qualified immunity is analyzed under the ordinary framework established for such motions.  *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).  A defendant who makes a properly supported motion for summary judgment based on the defense of qualified immunity shifts the burden such that plaintiff must produce evidence in opposition.  *Butler*, 370 F.3d at 964.  Thus, in resolving questions of qualified immunity on summary judgment, the court must decide whether, taking the undisputed facts in the light most favorable to the non-moving party, it can be said that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case."  *Id*. Under the law and facts outlined above, the court finds that defendant Thomas is not entitled to qualified immunity.

As noted above, plaintiff claims that on July 16, 2004, defendant Thomas forced him to sleep in an upper bunk even though Thomas knew that plaintiff had medical orders to be assigned to a lower bunk because of a visual impairment.  There is no doubt that a prison guard who knows

1    that a physician has prescribed care for a prisoner's serious medical needs, but refuses to provide

2    that care or in any way interferes with its provision can be said to have violated a constitutional

3    right. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Hutchinson v. United States*, 838 F.2d 390,

4    394 (9th Cir. 1988) (deliberate indifference occurs when prison officials deny, delay or

5    intentionally interfere with medical treatment"). As noted above, defendant Thomas did not

6    submit a declaration. The court must take the allegations in plaintiff's verified first amended

7    complaint as true and draw all reasonable inferences from the evidence in plaintiff's favor. Thus,

8    on the present record, the court finds that plaintiff's file contained some documentation of his

9    serious medical need and a finding that he required a lower bunk, and that Thomas reviewed

10   plaintiff's file with the Program Sergeant. The court also finds that Thomas denied plaintiff

11   access to a lower bunk and ordered other officers not to move plaintiff to a different cell. These

12   facts, if proven, would establish a clear violation of plaintiff's Eighth Amendment rights.

13        Furthermore, the court finds that the right was clearly established in July 2004, when

14   plaintiff fell from his bunk. Plaintiff's particular claim is that Thomas ignored a doctor's orders.

15   In 1976, when the United States Supreme Court decided *Estelle v. Gamble*, 429 U.S. 97, 105

16   (1976), that court stated that in order to have been deliberately indifferent, a defendant must

17   ignore or fail to respond to a prisoner's pain or possible medical need. Thus, it was predictable

18   that in the year 2000, the Ninth Circuit held that prison staff who ignored a physician's orders for

19   a prisoner to be given a liquid diet through a straw were deliberately indifferent to the plaintiff's

20   serious medical needs. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). Also, in 2003 it was

21   clear that a plaintiff alleging that prison staff who knew doctors had prescribed psychotropic

22   medications for plaintiff, yet who failed to dispense them to plaintiff stated a claim for relief

23   under the Eighth Amendment. *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 2003). The

24   circumstances in these two cases outline the contours of the right plaintiff alleges was violated:

25   that prison staff must obey a physician's orders that a prisoner receive particular treatment. That

26   the "treatment" here could be said to be an accommodation resulting from a medical condition is

inapposite.  For a man so visually impaired as plaintiff, a lower bunk is akin to crutches for a person with a broken leg.  Both crutches and the lower bunk authorization can be said to be palliative treatments in they enable a patient to engage in a normal daily activities.  Surely defendant Thomas would not assert the defense of qualified immunity if he were alleged to have refused to deliver crutches to a prisoner, despite a doctor's order.  For these reasons, the court finds that defendant Thomas is not entitled to qualified immunity.

Accordingly, it is hereby RECOMMENDED that:

1.  Defendant Thomas' April 30, 2007, motion for summary judgment be denied with respect to plaintiff's claim that around July 16, 2004, defendant Thomas was deliberately indifferent to plaintiff's need to be assigned to an upper bunk, resulting in plaintiff falling from his bunk on July 20, 2004;

2.  The remainder of defendants' April 30, 2007, motion for summary judgment be granted in its entirety; and

3.  Plaintiff be directed to file a pretrial statement within 30 days, and defendant Thomas be given 15 days after such service to file and serve a pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 4, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE