IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MELVIN MUNIR,

        Plaintiff,                         No. CIV S-05-1996 MCE EFB P

     vs.

J. THOMAS, et al.,

        Defendants.                 <u>FINDINGS AND RECOMMENDATIONS</u>

                                    /

        Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Currently under consideration is defendant Thomas' motion for summary judgment.[1] In the October 13, 2005, first amended complaint, plaintiff claims that defendant Thomas was deliberately indifferent to plaintiff's serious medical needs. He alleges that on July 16, 2004, defendant Thomas forced plaintiff to sleep in an upper bunk even though Thomas knew that plaintiff had medical orders to be assigned to a lower bunk because of a vision impairment.[2] As a result of this denial, plaintiff fell on July 20, 2004, while climbing down from

---

    [1] On March 28, 2007, the court granted the motion for summary judgment filed on behalf of all the defendants, except Thomas. Thomas has filed a second motion for summary judgment and the court directed plaintiff to file an opposition.

    [2] Plaintiff also alleges that on July 17, a different officer, Sgt. Stark, said he would speak to Thomas about plaintiff's housing, but that the officer said that he instead reviewed written

1

an upper bunk. Thomas contends that there is no genuine issue about whether he was deliberately indifferent. For the reasons explained below, the motion must be denied.

## I.     Facts

Plaintiff was admitted into California's prison system in January 1999. At the time of the events giving rise to this action, plaintiff was housed at the Ironwood State Prison ("ISP") or at California Medical Facility ("CMF"). Thomas was a housing sergeant at CMF. First Am. Compl. (Am. Compl."), ¶¶ 18-19, 39-40. He was responsible for supervising prisoner housing assignments in the unit where plaintiff was housed at the time of the events giving rise to this action. Def.'s Mot. for Summ. J., Stmt. of Undisp. Facts in Supp. Thereof, Exh. A, Thomas Decl., ¶ 2.

The CDCR has basic guidelines for a correctional officer's access to prisoners' medical files. Pursuant to CDCR policy, guards are not permitted to review documents in a prisoner's medical record. Def.'s Mot. for Summ. J., Stmt. of Undisp. Facts in Supp. Thereof ("SUF"), SUF 13. Thus, in order to convey medical needs that affect housing decisions, medical personnel prepare a written document, known as a "medical chrono," that informs guards of the problem and what the prisoner's needs are. *Id*. The medical chrono must be signed by the prisoner's treating physician and it must be approved by the chief medical officer. *Id*. Copies are distributed in order to ensure that the medical need appropriately is communicated. Thus, the prisoner gets a copy, as do the prisoner's correctional counselor and the facility captain. *Id*. Furthermore, a copy is placed in the prisoner's central file. *Id*.

Here, plaintiff's medical history involves a condition known as "bilateral keratoconus," which causes the cornea to take on the shape of a cone, resulting in distorted vision. SUF 1. In 1996, he underwent a corneal transplant in his right eye for this condition. SUF 2. Within a few

---

notes saying that pursuant to Thomas's July 16 directive, plaintiff was not to be moved to a different cell. Am. Compl., ¶ 32. Since plaintiff does not clearly allege that Thomas gave a second order not to move plaintiff, the court does not consider these events to be in issue.

weeks of arriving in the California prison system in 1999, he was found to be legally blind[3] in his right eye, but to have 20/20 vision in the left. SUF 3. By October 10 1999, he had developed advanced keratoconus in the left eye and the right eye corneal transplant had failed. SUF 4; Defs.' April 30, 2007 Mot. for Summ. J., Exh. B, Attach. 1, at 1, 2. The Chief Medical Officer ("CMO") at Ironwood State Prison, therefore wrote in a document entitled, "CMO to CMO Agreement (CMF)," stating that plaintiff had a visual disability that impacted his housing. *Id.*, Attach. 1, at 3. The CMO of ISP medically cleared plaintiff for transfer from ISP to CMF, noting that plaintiff "need[ed] a low bunk." *Id.* This note also stated that the "[m]edical chart must accompany the inmate." *Id.* Plaintiff was transferred from ISP to CMF on or around October 27, 1999. *Id.*, Attach. 1, at 4.

In July 2001, plaintiff was housed in an upper-tier cell. *Id*., at 10-11. On July 17, 2001, based upon an ophthalmologist's recommendation, the CMO at CMF gave written permission for plaintiff to wear dark glasses inside and outside. *Id*., at 8, 10-11. This authorization was to last for one year. *Id.* On February 22, 2002, a physician at CMF found plaintiff had a permanent visual impairment that did not impact his housing placement. *Id.*, at 13. There is no evidence that plaintiff's condition improved between October 1999 and February 2002. On June 25, 2002, the CMO renewed plaintiff's authorization for dark glasses, to be effective for one year. *Id.*, at 12.

Thomas relies heavily on the declaration of Dr. Crossan, a physician who reviewed plaintiff's medical records. He asserts that in June of 2002, plaintiff underwent a second corneal transplant in his right eye. SUF 5. By September of 2002, plaintiff had 20/30 vision in his right eye and by March of 2003, the graft had healed. SUF 6. Thus, plaintiff was not deemed legally blind. SUF 6. In July 2003, plaintiff sustained blunt trauma to his right eye. SUF 7. As a result, he again was found to be legally blind. *Id*. Because of this injury, plaintiff underwent

---

[3] The term "legally blind" refers to the level of visual impairment a person must show in order to receive disability benefits. SUF 7.

3

1  "open globe repair" surgery, after which he could perceive light but no image. SUF 8. In papers
2  generated in his discharge from the hospital following surgery in July 2003, an ophthalmologist
3  stated that plaintiff was nearly blind in the right eye and had substantial visual disability in the
4  left. *Id*. Thus, the doctor recommended that plaintiff be allowed to have a vest identifying him
5  as visually impaired, sunglasses, and eye shield, and a lower bunk. *Id*. However, no written
6  authorization was given for plaintiff to have these things. *Id*. As of April 13, 2004, plaintiff was
7  assigned to a lower bunk, but not based upon any written recommendation or authorization.
8  Defs.' April 30, 2007 Mot. for Summ. J., Exh. B, Attach. 1, at 30.

Following a prison riot in 2004, plaintiff was placed into administrative segregation. He was released on July 16, 2004, and taken to a cell where he was assigned to use the upper bunk. SUF 10. Plaintiff was to share the cell with a fellow prisoner, Johnson, who was assigned to the lower bunk. *Id*. An officer on duty (who is not a defendant), Officer Guerrero made notations in a log reflecting activity on the wing where plaintiff was housed on July 16, 2007. These notations show that plaintiff stated he could not share a cell with Johnson, but offered to share a cell with a different prisoner, Rodgers, who was assigned to the lower bunk in a different cell. SUF 11, 14. Guerrero made a notation that the housing sergeant said not to move Munir and that Johnson would have a cellmate until he found someone else compatible in order to work a trade in housing arrangements. SUF 12. Munir said he would rather return to administrative segregation than share a cell with Johnson. SUF 15.

Plaintiff's version of events contrasts with Guerrero's notes. He asserts that he told Officer Guerrero, who is not a defendant, that he had a written doctor's order to be assigned to a lower bunk because of his visual impairment. Am. Compl., ¶ 17. Guerrero ordered plaintiff to "lock up" in the cell while he went to discuss the matter with defendant Thomas. When Guerrero returned, he informed plaintiff that there was no lower-bunk orders in his file. *Id*., at ¶ 20. Guerrero asked to see plaintiff's copy of the order, but plaintiff could not produce it because his property had been confiscated while he was in administrative segregation, and it had not been

4

returned. *Id*., at ¶ 21-22. Plaintiff insisted that his medical file contained written authorization to be assigned to a lower bunk. *Id*., at ¶ 17. Plaintiff alleges that he found the medical chrono when his property was returned on July 19. *Id*., at ¶ 34. He attempted to inform "anyone who would listen to him," but unnamed prison officials refused to listen. *Id.* Significantly, plaintiff does not submit a copy of this order in support of his contentions.

Defendant Thomas, however, has submitted a declaration stating that he does not recall discussing this matter with Guerrero. SUF 12, 16. He asserts that his practice when a prisoner claimed medical authorization for a lower bunk but could not produce a copy of it was either to check himself or to have another officer check the prisoner's central file or facility captain's records to verify the claim. SUF 12. So many prisoners were housed at CMF that few lower bunks were available. *Id*. Housing staff had to ensure that prisoners had written medical authorization before assigning them to a lower bunk. *Id*. Thomas asserts that he did not become involved in housing decisions revolving around the question of whether prisoners were compatible. Def.'s Mot. for Summ. J., Exh. A, at ¶ 7. A Unit Sergeant was responsible for those decisions. *Id.*

On July 20, 2004, plaintiff fell while climbing down from the upper bunk of his cell. SUF 17. Plaintiff was taken to the medical clinic, where he reported severe pain in his lower back. Am. Compl., ¶¶ 39-40. Plaintiff explained that he was legally blind in his left eye and had no vision in his right eye. *Id.* The physician noted that plaintiff's lower back was tender, but found no obvious bruises or swelling. *Id.* The doctor ordered medication for muscle spasms and wrote a note stating, "Please house pt. in lower bunk" because of "visual impairment." Defs.' April 30, 2007 Mot. for Summ. J., Exh. B, Attach. 1, at 38. At around 5:00 p.m., plaintiff returned to his cell. *Id.*, Attach. 1, at 35. On July 28, 2004, an ophthalmologist and the CMO of CMF issued a written order that plaintiff should wear a vest that identified him as visually impaired, wear lightly tinted glasses, and be assigned to a lower bunk. Pl.'s Opp'n, Exh. B.

////

They noted that if no lower bunk was available at CMF, plaintiff should be transferred to "any facility which can meet his medical needs." *Id.*

## II. Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

6

essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

On January 18, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**III.    Analysis**

As noted above, plaintiff claims that defendant Thomas was deliberately indifferent to his serious medical needs and violated the Americans with Disabilities Act by refusing to assign him to a lower bunk even though Thomas knew that he had written medical authorization for a lower bunk.  Thomas contends that there is no genuine issue for trial on these claims.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A serious medical

need is one that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment, and chronic and substantial pain. *See*, *e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*). A prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison personnel risk Eighth Amendment liability if they knowingly prescribe specifically contraindicated medications, fail to treat a known, serious medical condition or ignore a physician's prescribed treatment. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989); *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 2003). Negligence in diagnosing or treating a medical condition, does not violate a prisoner's Eighth Amendment rights. *Hutchinson*, 838 F.2d at 394. Here, Thomas does not dispute that plaintiff has a serious medical need.[4] Instead, he contends that he does not recall plaintiff asserting that there was a written medical order for him to have a lower bunk. Defendant submits evidence that plaintiff requested a lower bunk because he did not like his cellmate, and not because of his medical needs. He also contends that if plaintiff had made such an assertion, he would have followed his pattern and practice of verifying the assertion, and in this case there was no such order.

////

---

[4] Thomas suggests that plaintiff's vision was good enough for him to maneuver in and out of an upper bunk. Defs.' Mot. for Summ. J., Exh. B, ¶ 9. He does not, however, make any argument under the applicable precedent that plaintiff did not have a serious medical need. Thomas also seems to argue that plaintiff is at fault because the level of impairment he suffered is in part due to an injury he sustained while playing basketball. *Id*. ¶ 5-6. However, whether plaintiff's activities contributed to his level of impairment is not before the court. The only questions before the court are whether there was an order for plaintiff to have a lower bunk due to a serious medical condition, and whether Thomas knew of this order but disobeyed it.

9

The court first considers whether there is a triable issue about the reason plaintiff requested he be moved to a different cell. Plaintiff asserts that he told defendant that there was a doctor's order for a lower bunk. Defendant Thomas submits evidence that plaintiff wanted to move because he did not like his cellmate, and that the move plaintiff requested would have landed him in an upper bunk anyway. Defendant's evidence consists of the handwritten notes by another guard on duty, Officer Guerrero. Guerrero noted that plaintiff said he could not share a cell with Johnson, but he could live with a different prisoner, Rodgers. Thomas also asserts that Rodgers was assigned to the lower bunk of the cell he occupied. Thus, Thomas asserts that plaintiff's request involved a conflict with a cellmate, which had to be resolved by the Unit I Sergeant.[5] By contrast, in the verified complaint plaintiff asserts in some detail that he told Guerrero there was an order for him to have a lower bunk, he could not produce it because he recently had been released from Administrative Segregation and was without his property, Guerrero went to talk to Thomas, and Thomas told Guerrero that there was no such order. Am. Compl., 4. Plaintiff's detailed verified complaint suffices as an affidavit. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (To function as an affidavit on summary judgment, a verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence.). It also contradicts defendant's version of the facts in material ways as to whether plaintiff wanted to move because of his medical condition or because of his cellmate.

In the alternative, Thomas asserts that he does not recall discussing plaintiff's housing with Guerrero. He asserts that based on his pattern and practice, he would have looked for a written order for a lower bunk if Guerrero asked him to. He asserts there was no order for plaintiff to have a lower bunk. The record on this motion is not at all clear and there appears to be a genuine dispute about whether an order existed. Any such order would have been based on

---

[5] Guerrero's notations state that in light of Munir's request, Guerrero, "[c]alled Unit I Sgt, he said to call housing. Called housing Sgt., he said will not move Munir. He says I/M Johnson is going to have a cellie until he finds someone compatible to switch with." Thomas Decl., Attach. 1, at 4.

10

plaintiff's visual ability, which fluctuated from 1999 until the time he fell in July 2004. In this time, different measures were recommended and taken to provide for his needs. Thus, in October of 1999, plaintiff's vision was so poor that when he was transferred from ISP to CMF, there was a "CMO to CMO Agreement," stating that his visual disability affected his housing and that he "needed" a lower bunk. Defendant Thomas does not explain the significance of this document.[6] Thus, it is not clear whether this agreement was in fact an order about plaintiff's housing assignment, whether it automatically was binding on physicians or anyone else at CMF, or whether a separate order was necessary for it to have any effect on CMF personnel. If it was binding on CMF personnel, it is not clear how long it was to remain in effect or whether a copy would have been in plaintiff's central file. Furthermore, there is a February 22, 2002, finding that plaintiff's visual impairment did not then impact his housing placement. But there is no evidence of what impact, if any, this had on the CMO to CMO agreement. Significantly, there is no evidence that plaintiff's condition improved between the time he was transferred to CMF and the time this finding was made. In light of the uncertainty about the significance of the agreement between the CMOs, the court finds that there is a genuine issue about whether there was an order for plaintiff to be assigned to a lower bunk.

Even if the CMO agreement was not an order that required Thomas to assign plaintiff to a lower bunk, there is a genuine issue about whether such an order existed. As noted, plaintiff's visual ability fluctuated. Thus, by March 2003, physicians did not consider plaintiff to be legally blind because he successfully had undergone a second corneal transplant in his right eye. It was not until July 2003 after another surgical procedure that plaintiff again was deemed legally blind, and a physician recommended that plaintiff be assigned to a lower bunk. Defendant is emphatic that there is no evidence anyone wrote such an order in the aftermath of this surgery. He also asserts that although plaintiff was assigned to a lower bunk in April 2004, this was not based on

---

[6] This was a crucial deficiency in Thomas's first motion for summary judgment. Findings and Recommendations, filed March 5, 2008, at 11-12.

1 any medical order.  Dr. Crossan, who reviewed plaintiff's medical file, does not specifically
2 assert that there was no order for a lower bunk in July 2004.  Thus, one possible inference is that
3 because there was no such order in July 2003, and none in April 2004, there was none in July
4 2004.  However, the record contains a possible explanation of why, in the face of a medical
5 finding that plaintiff required a lower bunk, plaintiff would not be given a separate "medical
6 chrono"[7] to document the medical requirement for such housing.[8]  Thus, another possible
7 inference is that the CMO to CMO agreement served as a medical chrono.  Among these
8 possible inferences, the court must drawn upon the one that favors plaintiff on this motion for
9 summary judgment.  Very plainly, there is a genuine factual dispute about whether there was an
10 order for plaintiff to have a lower bunk in July 2004 when he fell climbing out of his upper bunk
11 and that dispute is material.  Defendant Thomas is not entitled to judgment as a matter of law.

**IV.    Qualified Immunity**

Defendant contends that he is entitled to qualified immunity.  In resolving questions of qualified immunity, courts are required to resolve a "threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case."  *Id*.  A motion for summary judgment based on the defense of qualified immunity is analyzed under the ordinary framework established for such motions.  *Butler v. San*

---

[7] A "medical chrono" is a document containing information about a prisoner's medical problems and instructing guards what his needs are with respect to it.  SUF 13.

[8] While it is possible that an order separate from the agreement was necessary, the record contains no clear evidence of this.  Furthermore, it is possible that the prison was too crowded to formally and consistently accommodate plaintiff's needs.  Thus, plaintiff was simply allowed to use one in April of 2004 when one was available and physicians could not identify anyone needier than plaintiff.  If this in fact is the case, then it appears that plaintiff's rights were violated, but not necessarily by Thomas.

*Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). A defendant who makes a properly supported motion for summary judgment based on the defense of qualified immunity shifts the burden such that plaintiff must produce evidence in opposition. *Butler*, 370 F.3d at 964. Thus, in resolving questions of qualified immunity on summary judgment, the court must decide whether, taking the undisputed facts in the light most favorable to the non-moving party, it can be said that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case." *Id*.

Defendant's entire argument in support of this contention is the following:

> Defendant Thomas is entitled to qualified immunity because even if Munir could establish an Eighth Amendment claim, Sgt. Thomas could have reasonably believed, under the circumstances of this case, that he was not violating clearly established law by not assigning Munir to a lower bunk on July 16, 2004, because there was no medical chrono or disability verification instructing him to do so.

Def.'s Mot. for Summ. J., at 8. Thomas misunderstands the nature of qualified immunity. If there was no written order for plaintiff to have a lower bunk, then Thomas did not violate plaintiff's constitutional rights. Here, plaintiff alleges that there was an order for him to have a lower bunk. Although that there is a genuine dispute about whether such an order existed, if plaintiff prevails on that dispute the facts will have been determined that Thomas disregarded that order. Under the law outlined above, no reasonable prison guard would have ignored such an order. Thus, Thomas is not entitled to summary judgment on the question of qualified immunity on this claim.

**V.    Conclusion**

For the reasons explained above, the court finds that there are genuine issues for trial about whether there was a written medical order for plaintiff to be assigned to a lower bunk and whether Thomas was deliberately indifferent to the order. Therefore, Thomas is not entitled to judgment as a matter of law. The April 14, 2008, motion for summary judgment must be denied.

The court does not intend to entertain any further motions for summary judgment on these issues on behalf of defendant Thomas.

Accordingly, it is hereby RECOMMENDED that:

1. Defendant Thomas's April 14, 2008, motion for summary judgment be denied;

2. Plaintiff be given 30 days to file an amended pretrial statement; and,

3. Defendant Thomas be given 15 days from the date plaintiff serves his pretrial statement to file a pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 13, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE